# IN THE COURT OF APPEALS OF IOWA

No. 24-1130
Filed March 19, 2025

**PUDENZ TRUCKING, INC. and KENT PUDENZ,**
    Plaintiffs-Appellants,

**vs.**

**PUDENZ FARM COMPANY, INC.,**
    Defendant-Appellee.
_____

Appeal from the Iowa District Court for Sac County, Kurt J. Stoebe, Judge.


Plaintiffs appeal the district court's grant of summary judgment upon the court's determination that a preexisting settlement agreement between the parties barred plaintiffs' claims. **AFFIRMED.**


Benjamin Arato of Wandro, Kanne & Lalor, PC, Des Moines, for appellants.

F.D. Chip Baltimore, II of Law Office of Kirke C. Quinn, Boone, for appellee.


Considered by Schumacher, P.J., and Badding and Chicchelly, JJ.

**SCHUMACHER, Presiding Judge.**

Plaintiffs Kent Pudenz (Kent) and Pudenz Trucking Inc., (Pudenz Trucking) appeal the grant of summary judgment in favor of defendant Pudenz Farm Company, Inc. (PFC) on claims of breach of oral contract, breach of implied contract, and unjust enrichment. This appeal centers on the enforceability of a preexisting settlement agreement between Kent and Pudenz Trucking and PFC. The settlement agreement ended an earlier lawsuit (Lawsuit I) brought by plaintiffs against PFC and two other defendants that are not parties to the current lawsuit. Relevant here, Kent signed the agreement not only for the plaintiffs, but also for PFC, a defendant. Kent's act of signing on behalf of PFC—a fact he argues arose from a mutual mistake over PFC's ownership—is the foundation for plaintiffs' appeal.

After a separate action for declaratory judgment establishing Kent did not own PFC, plaintiffs initiated the immediate action. PFC moved for summary judgment, asserting the settlement agreement precluded plaintiffs' claims. Plaintiffs argued the settlement agreement was unenforceable under the doctrine of mutual mistake. The district court granted summary judgment, determining: the plaintiffs bore the risk of a mistake, barring them from asserting the mutual mistake as an enforcement defense; PFC ratified the settlement agreement; and adequate consideration supported the agreement. Upon our review, we affirm.

I.    **Background Facts & Proceedings**

Pudenz Trucking and PFC are distinct companies. Kent owns Pudenz Trucking. Kent's parents, Linus and Myrna Pudenz, formerly owned PFC. In March 2022 the couple divorced, and Myrna agreed to transfer ownership of her

PFC stock to Linus. After the divorce, Linus owned PFC completely. The divorce agreement also divided PFC's property, including farmland that at the time was leased by Pudenz Trucking. PFC retained ownership of a portion of the leased farmland. Ownership of the remaining portion was transferred to Myrna Pudenz Farm Company.

Linus Pudenz died testate on June 11, 2022. Linus's last will and testament, which was executed in 2010, contained the following provision regarding PFC:

> I hereby acknowledge that I have made an irrevocable, *inter vivos* transfer of all stock previously owned by me in Pudenz Farm Company, an Iowa corporation, for the benefit of my son, Kent E. Pudenz. I further acknowledge that because of said irrevocable transfer, such stock is not an asset of my estate and will not be distributed pursuant to the terms thereof. I am not unmindful of the fact that my spouse will not receive any benefit from the stock which I have previously transferred; *rather*, it is my view that she has been adequately provided for hereunder and no additional stock should be transferred to her because she individually owns a substantial amount of stock in Pudenz Farm Company.

But contrary to the text of the will provision, Linus never completed an inter vivos transfer of stock to Kent or to the Linus Pudenz Irrevocable Trust, which was executed the same day as Linus's will and to which Kent is the trustee and sole beneficiary. Linus still held complete ownership of all PFC stock when he died.

Lawsuit I began shortly after Linus's death. On June 17, PFC served Pudenz Trucking with a notice of default on rent allegedly owed for the farmland lease. In response, on July 7, plaintiffs filed the petition in Lawsuit I against PFC, Myrna, and Myrna Pudenz Farm Company. Plaintiffs brought a conversion claim against Myrna and Myrna Pudenz Farm Company and asserted a breach of contract claim against PFC. The petition also sought declaratory judgment that plaintiffs did not default on the farm lease and injunctive relief temporarily enjoining

the defendants from acting upon the alleged default. Although the deadline for Myrna to transfer her stock per the divorce settlement had passed by the time plaintiffs filed the complaint in Lawsuit I, service of process for all three defendants was served on Myrna.

In the interim, Kent began acting on behalf of PFC. According to Kent, he believed his appointment as trustee of the Linus Pudenz Irrevocable Trust authorized him to act for PFC. On June 29, Kent attempted to execute three PFC corporate resolutions. Collectively, two purported to name Kent as PFC's director, president, vice-president, secretary, and treasurer. A third attempted to transfer Linus's stock in PFC to the irrevocable trust. On July 7, the same day Kent filed the petition in Lawsuit I, Kent filed an amendment to PFC's articles of incorporation, changing the corporation's name. The next day, Kent signed a fourth resolution[1] directing the distribution of the PFC stock from the irrevocable trust to Kent.

On October 1, the parties to Lawsuit I executed the settlement agreement, which is the heart of this appeal. Kent signed the settlement agreement three times: for himself, for Pudenz Trucking, and as "a duly authorized agent for [PFC]." The settlement agreement authorized the dismissal of Lawsuit I "with prejudice of all claims . . . and causes of action asserted or which could have been asserted," "whether such claims or causes of action are known or unknown." The agreement also stipulated, "it is the intent of the parties to enter into a complete global and

---

[1] The resolution created on July 8 refers to PFC under the changed name, Hillview Holdings Company. As used throughout our opinion, "PFC" refers to the corporation under either name.

mutual release, settlement and discharge of any and all claims or causes of action each may have against the other that will fully and finally resolve any and all claims between the parties." Lawsuit I was dismissed with prejudice on October 6.

Roughly a week after the dismissal, Jason Pudenz, another of Linus and Myrna's children, filed a petition for probate of Linus's will and sought to replace Kent as executor of the estate. The petition charged Kent with attempting to transfer and liquidate Linus's assets and denied Kent had authority to act on behalf of PFC, "as neither [Kent] nor the trust was [PFC's] sole shareholder." In June 2023, a district court appointed Boone Bank & Trust Co. as executor of Linus's estate. On July 31, 2023, Linus's estate was declared "the sole and rightful owner of all shares of [PFC]."

Plaintiffs brought the current action against PFC in May 2023. Plaintiffs raised the following claims: (I) breach of oral contract, (II) breach of implied contract, and (III) unjust enrichment. Plaintiffs claim, until his death, Linus personally and on behalf of PFC made oral and implied promises to transfer all his shares of PFC stock to Kent. Plaintiffs say they relied on such promises when they submitted payments to and for the benefit of PFC, payments plaintiffs were otherwise under no obligation to make. Plaintiffs claim the payments were not gratuitous and PFC has failed to compensate plaintiffs because the PFC stock has not yet been transferred to Kent.

PFC moved for summary judgment, claiming the settlement agreement barred plaintiffs' claims. Plaintiffs argued the settlement agreement was voidable and ineffective because of a mutual mistake in the agreement's formation. Specifically, plaintiffs claimed "Kent signed the agreement with the understanding

that he was the owner of [PFC]," an act Kent says he would not have done had he known he was mistaken.  Plaintiffs also argued the settlement agreement was void for lack of consideration.  The district court granted PFC's motion for summary judgment.

In granting summary judgment, the district court determined plaintiffs' execution of the settlement agreement "released PFC from all claims brought by this lawsuit."  The district court rejected plaintiffs' argument that the settlement agreement was voidable due to mistake.  The court stated, "Plaintiffs' claims as to mistake of fact concerning PFC's stocks are directly contradicted and undermined by the record.  The Court finds it improbable that Kent could reasonably have been mistaken as to his right to ownership, or lack thereof, in such stocks."  And, even if a mistake had occurred, "Kent's representations in the [settlement agreement] render[ed] plaintiffs solely responsible for the assumption of risk associated with any potential mistakes of fact in executing the release."  The district court also held the settlement agreement was ratified by all parties, there was no failure of consideration, and plaintiffs' claim of mistake was untimely.  Plaintiffs appeal.[2]

## II.    Standard of Review

We review summary judgments for correction of errors at law.  *Clinkscales v. Nelson Sec., Inc.*, 697 N.W.2d 836, 840–41 (Iowa 2005).  A motion for summary judgment may only be granted if the moving party proves "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the

---

[2] Plaintiffs do not challenge the district court's determination that the settlement agreement's release of claims against PFC includes all claims brought in the immediate lawsuit.

affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Iowa R. Civ. P. 1.981(3). We "view the evidence in the light most favorable to the nonmoving party," affording them "every legitimate inference that can reasonably be deduced from the evidence." *Clinkscales*, 697 N.W.2d at 841.

Mere allegations and speculation are "not sufficient to generate a genuine issue of fact." *Hlubek v. Pelecky*, 701 N.W.2d 93, 95–96 (Iowa 2005). The record on summary judgment must "set forth specific facts showing the existence of a genuine issue for trial." *Id.* "A fact is material when its determination might affect the outcome of a suit. A genuine issue concerning a fact exists when reasonable minds can differ as to how a factual question should be resolved." *Homan v. Branstad*, 887 N.W.2d 153, 164 (Iowa 2016) (internal citation omitted).

In relation to settlement agreements,

> If the important facts [of the settlement agreement] are not in dispute, courts may summarily enforce the agreement on motion by one of the parties. . . . On the other hand, if the material facts surrounding the settlement are disputed, the issue must be resolved by the finder of fact.

*Wende v. Orv Rocker Ford Lincoln Mercury, Inc.*, 530 N.W.2d 92, 94 (Iowa Ct. App. 1995).

**III.    Analysis**

**A.    Mutual Mistake**

"A mistake is a belief that is not in accord with the facts." *Nichols v. City of Evansdale*, 687 N.W.2d 562, 570 (Iowa 2004) (quoting Restatement (Second) of Contracts § 151 (Am. L. Inst. 1981)). "Generally, mutual mistake will render a contract voidable by the party who is adversely affected by the mistake when the

parties are mistaken on a basic assumption on which the contract was made, unless the adversely affected party bears the risk of mistake." *State ex rel. Palmer v. Unisys Corp.*, 637 N.W.2d 142, 150 (Iowa 2001). A mistake of contract formation may render a contract voidable if the mistake is both mutual and material. *Id.* at 151. The party seeking avoidance of the contract bears the burden of showing a mutual mistake by "clear, satisfactory, and convincing evidence." *Gouge v. McNamara*, 586 N.W.2d 710, 713 (Iowa Ct. App. 1998).

Even if the party seeking avoidance can establish mutual mistake, such a claim can be defeated if that party bore the risk of mistake. *See, e.g.*, *Davenport Bank & Tr. Co. v. State Cent. Bank*, 485 N.W.2d 476, 480–81 (Iowa 1992); *see also* Restatement (Second) of Contracts § 154. There are three ways in which a party may bear the risk of mistake in contract formation: allocation by agreement, conscious ignorance, or allocation by the court. Restatement (Second) of Contracts § 154. Only one of the three possible means of risk allocation need apply to defeat the defense of mutual mistake. *See, e.g.*, *Davenport Bank & Tr.*, 485 N.W.2d at 480–81 (allocation by agreement); *Pathology Consultants v. Gratton*, 343 N.W.2d 428, 438 (Iowa 1984) (allocation by the court).

Plaintiffs argue the district court erred in granting summary judgment because the district court impermissibly weighed evidence to draw its findings and a factual dispute remained over the existence of a mutual mistake. Plaintiffs claim the dispute is evidenced by the district court's own language, which stated the district court found it "improbable that Kent could reasonably have been mistaken as to his right to ownership, or lack thereof, in [PFC's] stock." PFC characterizes the court's language as saying plaintiffs failed to present sufficient evidence on

which a reasonable jury could find a mistake existed. Assuming for the sake of argument that the summary judgment record creates a genuine dispute over Kent's belief in his ownership of PFC at the time of executing the settlement agreement and that this dispute is material to whether a mutual mistake existed, plaintiffs must still show the district court erred in determining plaintiffs bore the risk of mistake. *See Davenport Bank & Tr.*, 485 N.W.2d at 480–81.

**1. Allocation by Agreement**

Plaintiffs challenge the district court's adoption of PFC's argument that the settlement agreement allocated the risk of mistake to plaintiffs because Kent held himself out as an authorized agent for PFC. Plaintiffs argue this reasoning cannot stand without first resolving a factual dispute over whether a mutual mistake existed, which plaintiffs contend must be resolved by a jury. Plaintiffs argue "[o]nly once that jury question has been answered can the determination of who is to bear the risk be answered."

Plaintiffs' proposition is unsupported by the authority they provide. In *Davenport Bank & Trust*, our supreme court reasoned it was unnecessary to determine whether a mutual mistake existed because of the supreme court's "determination that [the defendant] assumed the risk of mistake." *Id.* at 481. The supreme court held the party bearing the risk of the mistake "is precluded from the defense of mistake as a matter of law." *Id.* We therefore turn to the question of whether the district court properly determined the agreement allocated the risk to plaintiffs.

When deciding whether parties have allocated the risk of mistake by agreement, a court should rely on general principles of contract interpretation.

Restatement (Second) of Contracts § 154 cmt. b. "'The cardinal rule of contract interpretation is the determination of the intent of the parties at the time they entered into the contract.' The language the parties used is the most important evidence of their intentions, and therefore, we endeavor to give effect to all language of the contract." *Homeland Energy Sols., LLC v. Retterath*, 938 N.W.2d 664, 687 (Iowa 2020) (quoting *C & J Vantage Leasing Co. v. Wolfe*, 795 N.W.2d 65, 77 (Iowa 2011)). "Absent provision to the contrary, a contracting party . . . bears the risk of many mistakes as to existing circumstances even though they upset basic assumptions and unexpectedly affect the agreed exchange of performances." Restatement (Second) of Contracts § 154 cmt. a.

The settlement agreement states, "Each party signing this Settlement Agreement and Global Release has authority to sign." Kent then signed the agreement on behalf of all parties to the immediate action and expressly represented he had authority to sign as an agent of PFC. The agreement further expresses the intent of the parties to release each other from any and all claims "to the fullest extent possible."

It is well established that a person who purports to act as an agent for another but who does so with no actual or implied authority can be held liable for a breach of an implied warranty of authority. *Ritz v. Mymor Homes, Inc.*, 213 N.W.2d 470, 472 (Iowa 1973); Restatement (Second) of Agency § 329 (Am. L. Inst. 1958). So parties assume at least some risk by holding themselves out as authorized agents. *See Ritz*, 213 N.W.2d at 472.

Here, Kent's act of signing as PFC's agent went further than to create an implied warranty of authority, he expressly warranted the existence of authority.

When considered in combination with the parties' intent to create an agreement that binds the parties "to the fullest extent possible," we interpret the contract as acknowledging potential issues of authority and warranting against it. The agreement contains no provision reserving a right of remedy in the event of a mistake of authority. By including the express warranty of authority, under these circumstances the settlement agreement preemptively allocated the risk of mistake of authority to those signing thereunder. *See Davenport Bank & Tr.*, 485 N.W.2d at 480–81 (finding an implied allocation of risk); *cf. Unisys Corp.*, 637 N.W.2d at 152 (determining no allocation of risk existed where the contract reserved a remedy in the event of a mistake of the type claimed by the aggrieved party). To determine otherwise would place a greater risk on purported agents who remain silent on their authority to act than that placed on agents who expressly warrant their authority to act, *cf. Ritz*, 213 N.W.2d at 472, and would negate the express warranty.

Under the mutual mistake exception of allocation of risk by agreement, Kent cannot now raise his own lack of authority as a reason to avoid the settlement agreement. *See* Restatement (Second) of Contracts § 154(a).

**2.      Conscious Ignorance**

Alternatively, the district court found, and plaintiffs now challenge, that plaintiffs bore the risk of a mistake because Kent consciously disregarded his awareness of his limited knowledge as to PFC's ownership.

Under the conscious-ignorance exception, even if the parties' agreement did not allocate risk, a mistaken party "may have been aware when he made the contract that his knowledge with respect to the facts to which the mistake relates

was limited." *Id.* § 154 cmt. c. If the party enters into the agreement and undertakes to perform thereunder despite his awareness of his limited knowledge, "he bears the risk of the mistake." *Id.*; *see, e.g.*, *Forbes v. Benton Cnty. Agric. Soc'y*, No. 20-1250, 2021 WL 1907130, at *5 (Iowa Ct. App. May 12, 2021) (applying the conscious-ignorance exception).

The summary judgment record shows that even if Kent did believe he owned PFC's stock at the time of executing the settlement agreement, Kent was aware that his knowledge of PFC's ownership was limited. Kent admitted to knowing about his parents' divorce settlement, including the stock transfer and stipulation that Linus owned 100% of PFC's stock as a result. Any claims by Kent that he believed the transfer had already occurred before the divorce conflicts with these admissions.

Kent also admits to knowing the identity of the law firm Linus purportedly used to issue stock certificates to the irrevocable trust prior to his death.[3] But Kent did not contact the firm to confirm the issuance before signing the settlement agreement. Had Kent done so, he would have learned Linus never issued the stock certificates, just as Jason later learned from a letter sent to Jason's attorney.[4]

---

[3] Though Kent's affidavit does not indicate when this alleged visit for the purpose of issuing stock certificates occurred, to support Kent's claim he believed he was PFC's sole shareholder when he signed the agreement, the visit would have had to occur after Myrna completed the transfer of her stock. The divorce settlement was entered on or about March 9 and provided sixty days for completion of the stock transfer. Linus died on June 11, roughly ninety days after the divorce settlement.
[4] Kent states in his affidavit, "I later learned through counsel that there were additional necessary legal steps that needed to occur in order for ownership of [PFC] to pass to me, as the . . . firm had apparently not drafted stock transfer documents for Linus to sign." He claims this discovery led to his decision not to

Instead, Kent began taking actions on PFC's behalf, including filing the amendment to the articles of incorporation, attempting the corporate resolutions, continuing business transactions, and settling Lawsuit I—which included claims that, had Kent owned PFC at the time he filed suit, could have been resolved internally. The basis for these actions, Kent admitted, was his "underst[anding]" that Linus had visited the law firm to complete a stock transfer prior to death.

While aware his knowledge regarding ownership of PFC was limited, Kent agreed to the settlement releasing any and all claims he and Pudenz Trucking had against PFC. Plaintiffs then undertook performance by dismissing Lawsuit I with prejudice, despite uncertainty over PFC. By proceeding despite being aware Kent's knowledge was limited, plaintiffs assumed the risk of a mistake. *See* Restatement (Second) of Contracts § 154 cmt. c.

### 3. Risk Allocated by the Court

Even if plaintiffs did not assume the risk by agreement or conscious ignorance, the district court determined allocation of the risk by the court was reasonable under the circumstances. Plaintiffs do not directly dispute this decision but attack it by arguing the district court improperly weighed evidence to make factual determinations.

A court may allocate a risk of mistake to a party "on the ground that it is reasonable in the circumstances to do so," *id.* § 154(c), such as when "it is reasonably clear that a party should bear the risk of a mistake for reasons other than [agreement by the parties] and [conscious ignorance]," *id.* § 154, cmt. d.

---

contest the application for declaratory judgment over ownership of the PFC stock by Linus's estate. There is no evidence of when Kent learned this information.

Assuming again that when the parties executed the settlement agreement Kent believed he owned PFC, it was reasonable under the circumstances for the district court to allocate the risk of mistake to plaintiffs. *See Pathology Consultants*, 343 N.W.2d at 438. In plaintiffs' own words: "Somewhat incredibly, Kent Pudenz signed the [settlement agreement] three times. Once on behalf of himself personally, once on behalf of Pudenz Trucking, and once on behalf of PFC," and "no third parties exist in this case—Kent was purporting to act as both principal, agent, and the opposing party, at the same time . . . . Kent was in fact neither the principal nor the agent." We add, no one asked Kent to assume these roles; Kent acted alone.

We agree with the district court that in such circumstances where an actor independently undertakes to act as both the principal and agent, acting in such roles on behalf of distinct parties representing both sides of a lawsuit, it is reasonable to assign to the actor the risk of a mistake.

Having concluded that plaintiffs bore the risk of a mistake under any of the three ways risk may be allocated, even assuming plaintiffs have established a genuine issue of material facts over the existence of a mutual mistake, defendants would be entitled to summary judgment; when the aggrieved party bore the risk of mistake, the mutual mistake defense fails as a matter of law.[5] *See, e.g.*, *Davenport Bank & Tr.*, 485 N.W.2d at 481 (affirming the trial court's grant of judgment notwithstanding the verdict).

---

[5] Because plaintiffs' assumption of risk defeats their defense of mistake as a matter of law, we need not address whether a mutual mistake actually existed or whether plaintiffs' reliance on mistake was timely raised.

**B.      Ratification of the Settlement Agreement**

Plaintiffs also challenge the district court's finding that all parties to the immediate suit ratified the settlement agreement.  They argue that neither they nor PFC ratified the agreement and, because the current litigation conflicts with the agreement's provisions, the settlement agreement is now void.  *See Nichols*, 687 N.W.2d at 571 ("A voidable contract is one where one or more parties have the power, by a manifestation of election to do so, to avoid the legal relations created by the contract, or by ratification of the contract to extinguish the power of avoidance." (quoting Restatement (Second) of Contracts § 7)).  As plaintiffs' assumption of risk bars them from avoiding the contract, the issue is whether PFC ratified the agreement or whether, by participating in this litigation, PFC manifested an election to avoid the settlement agreement.

PFC asserted the settlement agreement as an affirmative defense and attached a copy of the agreement to its answer.  Although plaintiffs contend PFC's inclusion of counterclaims shows PFC elected to avoid the agreement, PFC responded that such counterclaims were compulsory under Iowa's compulsory counterclaims rule.  *See* Iowa R. Civ. P. 1.241.  Plaintiffs provide no legal authority to support their argument that PFC's assertion of the affirmative defense—which is founded upon PFC's claimed ratification of the agreement—and PFC's inclusion of compulsory counterclaims, followed by adherence to judicial procedure, amounts to a manifestation of election to avoid the contract.  On the contrary, we determine the district court properly determined that the undisputed evidence showed PFC ratified the agreement.

## C.    Adequacy of Consideration

Plaintiffs also challenge the district court's determination that adequate consideration was exchanged to create an enforceable agreement.    Plaintiffs contend "without reciprocity from PFC agreeing to forgo claims against Kent, there was no consideration given."  But PFC did forgo claims against Kent; it dropped its right to pursue allegedly deficient rent payments and permitted Kent to continue to farm its farmland through the remainder of the 2022 season, which was the period in which PFC asserted default against Kent.  Kent continued to farm the farmland through 2023.  And an affidavit submitted by Boone Bank & Trust, the executor of Linus's estate, attested "no default of [the farmland lease] has been served or pursued by [PFC] since the notice of default served upon Plaintiffs shortly after Linus Pudenz's death in June of 2022."

PFC has shown consideration was given to Kent, and plaintiffs have presented no facts to generate a genuine dispute as to its adequacy.  We find no error in the district court's ruling on this issue.

## IV.    Conclusion

Because we conclude the district court properly determined plaintiffs bore the risk of a mistake by executing the agreement on PFC's behalf, PFC ratified the agreement, and the agreement was supported by adequate consideration, we affirm.

**AFFIRMED.**